And we'll move to the final case for argument today, McCarty v. Menard. That's 18-3069. And we'll hear first from Mr. Houser. May it please the court. Robert Houser on behalf of the plaintiff appellant, Robert McCarty. We're here today asking that, in fact, this court reverse the entry of a summary judgment entered by the trial court for the trip and fall and injury that Robert McCarty sustained at the Menard store on February 13th, 2017. The defendant, in its brief, to which we agree, and in fact, quoted the court at page 29, stated, the ultimate issue at hand is whether a Menard's employee caused the plaintiff's injury. Now, in fact, we've submitted the testimony of Ryan Lannert, second assistant outside yard manager, and the outside yard includes the East Barn where Mr. McCarty was injured. He was questioned by his own counsel. First question was, is it likely that a team member left a sign out like this or didn't push a sign in? His answer, it's possible. Defense counsel wasn't satisfied with that. So the question was, is it likely? To which Mr. Lannert said, yes, it is likely. We're assuming you're withdrawing your objections to lack of foundation. I, in fact, withdrew that at the time I filed the motion for reconsideration. Yes, Your Honor, but I did that earlier. But didn't he also go on to testify that an employee only would have moved the sign if there had been down stocking that day and there was no evidence of down stocking that day? Well, actually, the evidence is threefold. First of all, Lannert went showed a photo of, uh, but didn't he also testify after those initial questions that an employee only would have moved the sign if there had been down stocking? Yes. Yes. And there wasn't any evidence in the summary judgment briefing of down stocking that day. Was there? I think there was, Your Honor. What do you think the evidence of down stocking? Okay. One, that Lannert went showed the photo, uh, of the stack of pot, where in fact, Mr. McCartney had been throwing or flinging boards aside, said it's possible that down stocking occurred. Zach Anderson, who worked in the East Barn, as well as other employees of Menard's, said it could have been down stocking within two hours. Besides that, Your Honor, the reasonable inferences, think about this, uh, the down stocking involves where in fact you get a low pile, so you then take your forklift, you go get a new pile. Of the boards that you want. You move, you move the sign in front of the low pile to the side. You then take the forklift, move the low pile aside, get the new pile with the forklift, put it in that position. Then go back and take the old pile and put it on top. Now, wouldn't it, isn't it a reasonable inference to say that in fact, Mr. McCartney and his employee, Tristan Parks, were moving aside these undesirable boards is because they were old, they were bent, they were sitting on, on the bottom of this pile for a significant period of time, and that's why they went to get to the new, uh, new boards. I kind of think of it as like, you go to a grocery store and you go to the milk cooler, okay, and you generally look and say, all right, what is the, what is the latest one, and invariably they pushed the undesirable, that is the oldest bottles first, okay, and sometimes you in fact find that they're spoiled if in fact you don't look at it closely. Is that what they did when they down-stocked? I'm sorry, what? When they down-stocked, did they put the part on the bottom on the top? Do you all? Is that what the evidence showed? Yeah. Not with the milk, but with the boards. That's exactly how the down-stocking is done. Did somebody testify to that? Oh yes, yes. It's in the brief, um, and that's in fact how it is done, uh, that you put the old ones on top. And the idea is obviously, let's get rid of these. And did somebody from Menards testify to that? Yes, ma'am. A number of, a number of people did. Zach Anderson testified as to how down-stocking has occurred. Um, I believe Brian Lannert testified as to how down-stocking is. In the brief, in fact, uh, we went through it in some detail. So let's say, I'm sorry. Let's say you can draw the inference that at some point down-stocking occurred. Right. What's the evidence that it occurred that day? Well. Either circumstantial or otherwise, because that's what, based on the, the testimony of Mr. Lannert and the other testimony about how they cleaned things up at the end of the day, it would have had to happen that day. So what's the evidence that down-stocking occurred that day? I can't say other than what Mr. Lannert and Mr. Anderson both said. Anderson looked at the piles that could have been done as recently as two hours before. With all these piles of boards, would you expect anybody to say, I mean, you see this, the huge east barn with these piles of boards, would you really expect somebody to say, I remember working on this undistinguishable pile of boards and down-stocking. That's why, in fact, I think you have to allow the reasonable inferences to be an admission against interest. In this case, Anderson and Lannert both stated that in fact, yeah, I can't, it could have been done as recently as two hours before. And that's why I also stressed when you had Lannert state, I think it's likely that in fact, this was done by a team member out of laziness. This is a fellow who is in fact, one of the managers at the outside yard. He would have the expertise. This is not something where in fact, I'm asking him or browbeating him. This is in fact, asked by his own counsel and is to which he said, yeah, it is likely because of the laziness of a team member. And then later on, well not later on, but Anderson in a separate deposition testified, he's known in fact, it's not an unusual occurrence to have these signs out. And in fact, he said he was asked also, and I think it's on page 177 of his deposition, which I think for docketing purposes, 55.55-6, he said that in fact, why would that be? Laziness of a team member, not putting it back in. So applying that to the Donahoe decision, which of course was cited both by our brief, but also discussed by the trial judge. He in fact stated, he utilized it, but then distinguished it. But Donahue in fact states, Illinois Supreme court decision, which is continued to follow the present time. In fact, that's why the trial judge cited Pollock and Berger versus Kmart, because it was such a recent case citing Donahue. And Donahue basically says that if in fact, you can show that the substance in this case, the sign and the legs and the legs are a key part of this. If they're related to the defendant's business and you show by a scintilla of evidence, by slight evidence, circumstantial or otherwise, that in fact, it's likely caused by a defendant's employee or by the defendant, that in fact, that's sufficient to go to the jury and should go to the jury. Now we have the elephant in the room. Okay. The defense, very artfully, and I think misled the trial judge by framing, remind me of in law school, if I can remember that far back, the Socratic method, where in fact the court, I'm sorry, where in fact the professor would frame a question and he would frame the question so that you'd have to give a certain answer. And if you didn't, you were kind of stuck. Well, in fact, in this case, the defense counsel has very artfully kept talking about, you know, the sign, okay. The big, the green 12 by 12 by 18 sign. It was 12 inches high off the ground, but throughout his brief, you'll note, he doesn't say a thing about the legs and it's the legs that in fact, Mr. McCarty tripped over. And in fact, the only thing that he says in his entire brief is in fact, he tries to claim that the two inches by four inches, two by four are actually two feet by four feet. Well, that's silly. You just look at the picture and you know that a two by four is two inches thick. And in this case, approximately four inches wide. But you want to save the rest of your time for rebuttal? I, yes, I do. Okay. Thank you very much. Thank you, Mr. Couser. Stranders for the defense. Good morning, counsel. Oh, good afternoon, counsel. Good afternoon, your honors. I am very proud to represent Menard Incorporated. My name is Tony Andrews. And I am happy to start with those questions if you care to, or I'm happy to also present with my analysis. Any preference? I'll deal with it because it's obviously a sticky issue in the cage. Your honor was quite right that on the issue of down stocking, there is no evidence that it was down stocked that morning. You're absolutely right that the record is abundantly clear that the place was clean as a whistle first thing in the morning. It was cleared up the night before. Any activity was done the night before. There's also no dispute. There was a, it was a, I think a hundred percent was clean was the quote. And counsel's also right that we should use some reasonable inferences to draw some conclusions. And your honor had some, some good questions and I trust that you have seen some of these pictures, but this one begs a little detail analysis. Counsel seems to suggest to you that you should infer that the pile he was working on, if I may deem him a little bit from the podium. Please stay close because we're recording from that microphone. Yes, your honor. The pile he was working from, the pile that had the sign stuck out was to his right. Counsel suggested to you a moment ago that the fact that they had shed five this way and five that way on the blue pile, if you may recall the photographs, the blue pile in the center was the pile from which the plaintiff and his colleague were working. It is the pile to the right of him, just in the four corner of this is the, you know, predominant picture you've seen that were taken by the plaintiff's colleague, it is the pile to the right of him in the orange from which the sign was pulled out. This is where the trip occurred. This is where the hazard was presented that we pretend was open and obvious, but to suggest that because he shed blue sheets to the left and right, because they were defective or bumped or wrong with some suggestion that this had been down stock might be true. It's a pure guess, but it has nothing to do with the pile he's talking about. It has the offensive sign that's sticking out because the offensive sign that was open and obvious is the one in front of the orange pile and the one in front of the orange pile is a different material, a different thickness. In fact, it says right on it, seven sixteenths, but the point is this is an undisturbed pile. The orange pile has no, and there's several pictures of this taken again by the plaintiff's colleague indicating that they were shedding to the right and to the left, the pile to which he was concerned with, or he complains about the sign being in front of is the orange pile. I'll also, as a better picture, this is Plaintiff's Exhibit P in the record at page 1104. This is the orange pile from which the sign was pulled out. These are the blue piles, the blue sheets he shed over to the right, and whether he threw them or dragged them is a different story, but this is an uninterrupted original pile. You can tell because there's no interruptions in the paint or the lettering on it, and furthermore, you can also infer there was no down stocking of this one at all, because it's lower than its original state, and your honor, counsel is absolutely right, the record does reflect that when we are down stocking, we do take the low portions, that's five or six that was too low to be served, we should bring it, that's called the service stack, we should bring in a different one so that people can reach it and it's plain to use. We do take the few to the side, and we do take that sign out of the way, and then we do get the forklift and take the big pile, the new pile, and put it down, that's down stocking. Then he's right, the record does reflect, you take the old ones, put it back there, but thereby, that pile, after down stocked, is at a minimum taller than the original because you've got the new freshly unbound stack with the blue on top, or whatever the color is on top. So this day, this is original, this is original, nothing has been down stocked to the point, to the side he's concerned about, with the green sign, the one that's 12 by 18, the one that he said he saw when he drove past, the one he said he was looking, working at from the next door. So I just wanted to make the point that this suggestion that the down stocking was because the sheets of blue were old, or discarded with some evidence of down stocking, may or may not be true, and may or may not happen today. But the subject of inquiry is the sign to his right, the sign that was sticking out in front of the orange pile, no evidence whatsoever of down stocking of that pile at any point in time of reason, and certainly not that day. So to the extent that one witness of 12, and yes, when pushed, and maybe regretfully on my part, suggested he guessed, it might have, it was likely of them, as you're right. You didn't ask him to guess or speculate? No, no. Not a good question, I'll agree with you. But even you follow... You told us in your brief he was asked to speculate. That's not the language in the deposition. With the question, you're absolutely right, Your Honor. The question is, was it likely? It was, and he said, yes. And I asked him why, and he had no basis. And then he later goes, I don't know. So, but even if we accept that language, we accept their verbiage that I drew from him, the question really is not, is there some evidence that there might have been some involvement from Menard? But the question that this court asks us to, this very district, this very circuit asks us to look at, is does that scintilla of evidence, does that little bit of evidence lead to a conclusion that it was more likely than not that the defendant placed it there? And when you add all the other circumstances that we just described, that there was no downstocking, evident in the data that we have, words of lawyers, one thing, data, another, this is the plaintiff's picture. This is an uninterrupted, unstacked orange pipe. Could you state for the record, which we've got all these in black and white. So your discussions of what's orange and blue are enlightening, but what are you pointing to? That's a very good point, Your Honor. I apologize. The one I was most recently speaking about is with the orange pile with the green sign in front that is pulled away, with the big LP in it, is document 62-16, page 1104. And it clearly shows only the green piles, with blue on top slightly, because those are the ones the plaintiff has just told us he discarded from the blue pile. And the other ones that you're referring to? Yes, Your Honor. The primary exhibit that we both rely on is the one that depicts the plaintiff in excruciating pain that his friend took, is 55-4, page ID is 484. That one shows orange in the background, orange in the foreground, and blue in the middle. Thank you. And again, the plaintiff was shedding off the blue. His desired purchase was the blue in the middle, right in front of his head. But the sign that he fell over is in front of the orange in the foreground of that picture. And then I think that enumerates it. So the question then becomes, is it more likely that Menard did it? A guest did it, or a vendor did it, or Menard did it? And I would ask you to look at, you know, Piotrowski is the analysis. And this court just heard this four years ago, Piotrowski versus Menard. The question is, is that evidence, however slight, infer it's more likely that the defendant did it than a vendor or a guest? Whether this guest or another guest, the question is, is it more likely? I conclude it is certainly not more likely that Menard did it under those circumstances. That's exactly what Judge Kohl ruled. And I ask you to consider the same when you look at the evidence in this case. Mr. Cozzi was the store manager, is that right? He was the general manager of the store. And what should we make of his testimony that he would not expect team members to clean up this sort of thing if they saw it? Yes, it's a very good question, Judge. And this is the guy who's in charge of the store. And he says, I don't expect my low-level employees who are running around with the pallet jacks and the forklifts to do that type of straightening just for aesthetic purposes. Because no one at our store, him or anyone else, saw this as a true hazard. Could someone potentially trip over it? Yes. I believe he can yield that and we would yield that. Yes, someone could potentially trip over it. But the point is, and the law holds, we're held to the burden of, would we reasonably expect someone would see it and go around it? And yes, we do. And so, yes, Mr. Cozzi says, I wouldn't expect him to do it because, yeah, it's not pretty, but I don't expect my guys who forklift to make it pretty. I just want them to move stuff. So that is his position. And it makes sense when he doesn't see it as a hazard. He saw it as an aesthetic issue. And he likes orderly and he's kind of OCD, but that's another issue. So that's Mr. Cozzi. Anything further? Well, there is, Judge, only because that's the issues that Your Honor raised. And that's what counsel talked about, but that's just half of the puzzle. Now, I get that. Why don't you take 30 seconds to summarize the other half? The other half is real simple. We're familiar with the briefs and the evidence in black and white. Likelihood that we did it is only one part of the puzzle. That's a four leg argument. I win that argument on proximate cause. The other question is duty. We win on duty and I can win this case on either one. Duty is because this is open and obvious. I don't care how you look at that. Any reasonable person, not Mr. Mr. McCarty. It doesn't have to be Mr. McCarty to any reasonable person who drives up to it, walks up to it, works next to it, sees the legs, the legs have to be there. And you're absolutely right. It's legs that are critical. Those legs are open and obvious. That's what Judge Coe found. That's what I think you will find when you read, look at the photographs in color might help. And, and if I can get you some, I'd be happy to do that. So we went on both legs, the proximate cause leg that is not more likely Menard did it and, or on a duty leg, because we have no duty to warn of an open, obvious hazard. So I ask that you affirm Judge Coe's rationale and find that Menard to tell the summary judgment of this case. Thank you very much, Mr. Andrews. How much time was left? I get two minutes. So, okay. Thanks. Rebuttal, Mr. Hauser. Yes. Thank you very much. Your honors. This in fact is what Mr. the defense counsel is referring to. Okay. And he, in fact, and can you tell us what you're pointing to Mr. Hauser? This is exhibit O. I can't tell you which, but in fact, I'll be glad to leave this with the court. So is that to the summary judgment briefing? It is. But it's also, I believe, yes, but in any event, the blue, the blue pile is in fact, what Mr. Andrews has just said is what was downstocked. He acknowledged that, but he said that doesn't matter because it's the orange pile that Mr. the sign and sign in front of that. In fact, Mr. McCarty tripped up, which he's correct, but I think he's already answered it. But if you think about it, what he was saying, wasn't he ultimately saying it is a fact question as to whether or not this occurred, but you have defense counsel acknowledging that it was the downstocking of the blue pile. You have, in fact, McCarty throwing piles, throwing boards, and then he took one step and then he tripped coming back to finish up. I want to, listening to them, it sounds to me like if in fact, forget about caveat emptor, buyer beware. It sounds like enter at your own risk. We don't care if we set something up, the court talked about, in fact, what Mr. Kazi said, not only did he say, Hey, team members don't bother. You got more important things to do. But in fact, Anderson in fact stated, if I'm on a forklift and I am most of the time, I'm not going to bother with this. This is in fact, the form also that was to be filled out on a daily basis as to showing that in fact, safety inspections had been completed, including fixing tripping hazards. Okay. It wasn't completed. And if it was completed, Kazi would throw it away the next day, despite the fact that it was supposed to be kept for 90 days. It's an interesting way of saying, we don't have any problems. You know, we don't, we don't need any stinking matches or forms because we throw them away. If I may, lastly, last item. Okay. The defense relies on Dunn versus Menards. Okay. First of all, Piotrowski talks about a couple of rocks. That has nothing to do with this case, but Dunn talks about open and obvious. In the language there, it says two things. One, that it's plaintiff's knowledge and it's undisputed facts. Mr. McCarty did not know. He did not see the legs that he tripped over, nor did Parks. And the facts are disputed. And lastly, as far as... That was last. All right. Excuse me. The case is taken under advisement. Thanks to counsel on both sides. The court will be in recess until Monday. Thank you very much.